# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**DONALD HOLTON (#96835)**                                        **CIVIL ACTION**

**VERSUS**

**BURL CAIN, ET AL.**                                                **NO. 11-0749-BAJ-RLB**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on June 17, 2014.

 

 

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

DONALD HOLTON (#96835)                                    CIVIL ACTION

VERSUS

BURL CAIN, ET AL.                                         NO. 11-0749-BAJ-RLB


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter comes before the Court on the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The State has filed a response in opposition to the petitioner's application. There is no need for oral argument or for an evidentiary hearing.

The petitioner, Donald Holton, challenges his conviction, entered in 2005 in the Twenty-Third Judicial District Court for the Parish of Ascension, State of Louisiana, on one count of second degree murder. He contends (1) that the trial court wrongly refused to hear testimony from a newly discovered witness, (2) that the State failed to disclose favorable deals which were made with informant witnesses, (3) that the State presented false and misleading expert testimony regarding an analysis of glass shards found at the scene of the offense, (4) that the State failed to disclose exculpatory evidence learned from a witness during a pretrial interview, (5) that the State presented false and misleading eyewitness testimony at trial regarding the time that the petitioner was in possession of the blue GMC vehicle that was thought to be involved in the offense, (6) that he was denied his Sixth Amendment right of confrontation when the State misled the Court relative to an objection made by the State during the defense's cross-examine of a sheriff's detective, (7) that he was provided with ineffective assistance of counsel at trial, (8)

that he was provided with ineffective assistance of counsel on appeal, and (9) that the trial court erred in refusing to allow the presentation of witness testimony during a subsequent post-conviction review proceeding.

Factual Background

On the night of August 31, 2004, according to the evidence adduced at trial, an Ascension Parish resident heard a gunshot outside his residence at approximately 10:30 p.m. and, upon investigation, discovered the victim, Jessie Bonds, slumped over in the cab of a white Chevrolet pickup truck that appeared to have run off the road. Both front windows of the vehicle were shattered, and the victim, who was pronounced dead at the scene, had a gunshot wound to the left side of his body. There were no eyewitnesses to the murder. An investigation of the crime scene revealed that the victim appeared to have been shot through the driver's side window of the vehicle as he drove through a nearby intersection. Further investigation disclosed that the victim had recently been dating a woman, Toni Everett, who was determined to be the ex-girlfriend of the petitioner. Upon contacting Ms. Everett, investigating officers were informed that the petitioner had recently been harassing her and was not happy about her relationship with the victim.

During the ensuing investigation, Sheriff's Office employees contacted a friend of the petitioner, Ronnie Buratt, who initially advised that he had loaned his blue GMC pickup truck to the petitioner on the night of the offense, and that the petitioner had returned the vehicle at approximately 9:10 p.m. that evening. Tr. Rec. at p. 792. Buratt later acknowledged, however, in a subsequent statement and in testimony at trial, that the petitioner did not return the vehicle that night at all but, instead, telephoned Buratt's residence at around 11:00 p.m. and requested

2

that somebody come bring the petitioner's vehicle to him at a nearby location.  Tr. Rec. at pp. 822 and 840.  Buratt testified that, as a result, he and two friends, Randall Gill and Robbie Huber, all of whom were at Buratt's house at the time, drove in two separate vehicles to bring the petitioner his vehicle, after which Buratt returned home.  Thereafter, Buratt received another telephone call from the petitioner, during which the petitioner reported that the blue GMC vehicle had been involved in an accident and requested that Buratt report the vehicle stolen.  Tr. Rec. at p. 688.  Accordingly, Buratt and Randall Gill – who was the registered owner of the blue GMC pickup, despite having sold the vehicle to Buratt – called the Sheriff's Office and falsely reported the blue GMC vehicle stolen.  In addition, Buratt testified that he requested that another friend, Joey Farmer, who was also at Buratt's house, dispose of some shotgun shells which were inside the house, by throwing the shells into a nearby pond.  Finally, Buratt testified that the petitioner ultimately returned to Buratt's house later on the same evening and admitted to Buratt, before leaving again, that he had "killed a dude" that evening while driving in Buratt's blue GMC vehicle.  Tr. Rec. at p. 689.  The foregoing chronology of events was corroborated, in substantial part, by testimony provided by Randall Gill, Angela Gill (Randall Gill's wife), Joey Farmer and Robbie Huber, all of whom had been at Buratt's house that evening.

Further investigation revealed that very early the next morning, the petitioner, still in possession of the blue GMC vehicle, drove the vehicle to the home of another acquaintance, Roger Holder, and requested that Holder assist in transporting the vehicle to Springfield, Louisiana, in nearby Livingston Parish.  In compliance with this request, Holder followed the petitioner to Livingston Parish in a separate vehicle and, after leaving the blue GMC vehicle,

drove the petitioner back to Ascension Parish.[1]  According to Holder, the petitioner retrieved the license plate and other papers from the GMC vehicle before leaving it and disposed of the license plate during the return trip by breaking it into pieces and throwing the pieces from the window.

When law enforcement officials recovered the blue GMC vehicle later on the day after the offense, they found it to be without a licence plate and with the passenger side window shattered.  A gunshot residue test was performed to the interior passenger-side window rim, and an expert in gunshot residue analysis, Elana Foster, testified that the test came back positive for gunshot residue.  This was consistent with the State's theory that the petitioner had fired a shotgun from the interior of the blue GMC vehicle, out through the passenger side window thereof, and into the driver's side window of the victim's vehicle.[2]

The gunshot residue analyst also testified regarding a gunshot residue test that was conducted on the petitioner's hands approximately 13 hours after the offense.  According to the expert, a gunshot residue test should normally be conducted within 3 or 4 hours after discharge of a firearm.  Notwithstanding the delay, however, and although the test was not conclusive for gunshot residue on the petitioner's hands, it was consistent therewith.  Specifically, the expert

---

1.  Evidence was introduced that the place where the vehicle was abandoned was the yard of another acquaintance of the petitioner, Michael Inman, and that the petitioner had telephoned Mr. Inman early on the morning after the offense and left a message requesting a quick return call.  Mr. Inman testified that he did not retrieve the message until later in the day and was then unable to make contact with the petitioner.  Instead, Mr. Inman discovered the blue GMC in his yard, without licence plates, and called the police, whereupon a check of the vehicle's registration disclosed that it had been reported stolen the night before.

2.  Ronnie Buratt testified that the passenger-side window of the blue GMC vehicle was broken, such that the window could not be lowered.  As a result, an assailant firing from the interior of the vehicle would have had to shoot through the glass.

testified that a positive test result requires the presence of a sufficient quantity of three elements, lead, barrium and antimony, and whereas the petitioner had a sufficient quantity of lead and barrium on his hands, the quantity of antimony, albeit present, was not sufficient for a conclusive positive result.

Maureen Botrrell, an F.B.I. expert in glass analysis, testified at trial regarding her analysis of glass shards recovered from the two vehicles (the vehicle driven by the victim and the blue GMC vehicle) and also from the roadway at the site of the shooting. According to the opinion of the expert, a comparison between the samples recovered from the roadway and the samples obtained from the two vehicles revealed that the glass in the roadway was "indistinguishable" from the glass obtained from the two vehicles.

Testimony was also introduced at trial regarding statements purportedly made by the petitioner and actions purportedly undertaken by him during the weeks prior to offense. The petitioner's ex-girlfriend, Toni Everett, testified – apparently reluctantly – that the petitioner had been harassing and following her during the weeks preceding the offense and both knew where the victim lived and also the route the victim took to drive to and from his residence. Ms. Everett further testified that the petitioner had been making statements to her that they should get back together, that she should not be with anyone else, and that he couldn't tolerate the thought of her being with another man. Testimony was also elicited from two of Ms. Everett's children, Brandon and Matthew Everett, regarding statements that they had provided to investigating officers shortly after the offense, wherein they both indicated that they had overheard the petitioner say, approximately two weeks prior to the offense, that if he could not be with their mother, no one would. Matthew Everett's statement to investigators had also indicated that the petitioner had attempted to say goodbye to Matthew in the days preceding the offense, "because

[the petitioner] said he wouldn't be able to see us again because something bad was going to happen." *See* Tr. Rec. at p. 737. Both Brandon and Matthew Everett, however, in their respective trial testimony, sought to recant their prior statements to police investigators, with Brandon testifying that he had not overheard the petitioner make the referenced statement, *see* Tr. Rec. at p. 730, and with Matthew testifying that he had made both statements up. *See* Tr. Rec. at pp. 737-38. Notwithstanding, two additional witnesses at trial, Penny Zito and Amanda Gros, also testified regarding having overheard the petitioner say, approximately two weeks prior to the offense, that if he could not have Toni Everett, no one would.

In addition to the testimony described above, Ashley Alford testified that she was at work at a nearby commercial establishment on the night of the offense and observed the petitioner in possession of Buratt's blue GMC vehicle when he came to the establishment and purchased gas for the vehicle. Ms. Alford estimated the time as being around 9:45 p.m. because she recalled it as being near the 10:00 p.m. closing time when she saw the petitioner with the vehicle. Toni Everett was also working at the referenced establishment on the night of the offense, and she testified that she saw the petitioner there at around 9:00 or 9:30 p.m. She further testified that, whereas she had told sheriff's detectives on the night of the offense that the petitioner had been driving Buratt's blue GMC vehicle, she had not in fact seen the vehicle the petitioner was driving because she had been working in back at the time.

Finally, testimony was presented by Shane Richey, a prisoner who was confined with the petitioner in the Ascension Parish Jail for a period of time after the petitioner's arrest. According to Richey, the petitioner admitted, during a conversation in the prison yard, to having borrowed Ronnie Buratt's truck, to having flagged down the victim's vehicle at the site of the shooting, and to having "pulled up in the truck next to [the victim] and [blown] his head off."

6

*See* Tr. Rec. at p. 719.

As a result of the investigation, not only was the petitioner arrested on a charge of first degree murder, but Ronnie Buratt, Robbie Huber and Joey Farmer were all arrested and charged with being accessories after the fact to first degree murder, and Randall Gill was charged with having filed a false stolen vehicle report.

<u>Procedural Background</u>

Prior to trial, the State amended the charge from one count of first degree murder to one count of second degree murder. After a jury trial conducted in July, 2005, the petitioner was found guilty as charged and was subsequently sentenced, in November, 2005, to life imprisonment, without the benefit of probation, parole or suspension of sentence. The petitioner filed a timely appeal, asserting claims not pertinent hereto. On March 23, 2007, the petitioner's conviction and sentence were affirmed by the Louisiana Court of Appeal for the First Circuit. *State v. Holton*, 953 So.2d 207 (La. App. 1st Cir. 2007). The petitioner thereafter sought supervisory review before the Louisiana Supreme Court, which Court denied review on November 9, 2007. *State v. Holton*, 967 So.2d 500 (La. 2007). Upon the failure of the petitioner to file an application for a writ of certiorari in the United States Supreme Court, his conviction became final on February 7, 2008, upon the expiration of the ninety-day period allowed for him to do so.

Approximately nine (9) months later, on or about November 6, 2008, the petitioner filed a counseled application for post-conviction relief ("PCR") in the state trial court, wherein he asserted (1) that a theretofore unknown witness had been discovered (identified as Jeremy Holton) who had not testified at trial but who had been brought to the trial court's attention in a motion for new trial which had not been ruled upon by the trial court, (2) that the State had failed

7

to disclose favorable deals which the prosecution had made with Ronnie Buratt and Shane Richey in exchange for their testimony, and (3) that the State had presented false and misleading expert testimony with regard to glass shard analysis. Through the *pro se* filing of a supplemental PCR on or about November 20, 2008,[3] the petitioner presented the additional claim that his right to due process and a fair trial had been denied because, in addition to the claims enumerated above, the State had withheld exculpatory evidence in the form of information obtained during a pretrial interview with a witness, Ashley Alford, which information could have been used to impeach the testimony of other trial witnesses. Finally, on or about November 11, 2009, more than a year after the filing of his initial PCR, the petitioner filed a second supplemental *pro se* PCR application, asserting the claims (1) that the State had presented false and misleading eyewitness testimony regarding the petitioner's possession of the blue GMC vehicle allegedly used in the offense, (2) that the State had misled the Court during an objection to the defense's cross-examination of a sheriff's detective at trial, resulting in a violation of the petitioner's right of confrontation, (3) that the State had presented testimony regarding an inconclusive gunshot residue report without presenting the author of the report for cross-examination, resulting in a

---

3. Although the petitioner's supplemental *pro se* application for post-conviction relief was docketed as filed in the state trial court on November 24, 2008, the United States Court of Appeals for the Fifth Circuit has concluded that federal habeas courts within the State of Louisiana must apply Louisiana's "mailbox rule" when determining the filing date of a petitioner's state court filings. Accordingly, pleadings submitted by a habeas petitioner are considered to be "filed" in state court as of the moment that the prisoner places them in the prison mail system for filing, not on the date that the pleadings are ultimately docketed by the receiving court. *See Causey v. Cain*, 450 F.3d 601, 607 (5th Cir. 2006); *Lane v. Rogers*, 2012 WL 3160034, *1 n. 3 (E.D. La. June 21, 2012). Thus, inasmuch as the petitioner apparently signed his supplemental application on November 20, 2008, and presumably gave it to prison officials for filing on that date, the Court will utilize that date as the presumptive date of filing. In addition, in hereafter referencing the dates of filing of the petitioner's various pleadings in the state courts and in this Court, the Court will utilize the dates that the petitioner signed his respective pleadings as the date of filing thereof in the respective courts.

violation of the petitioner's right of confrontation, (4) that he had been provided with ineffective assistance of counsel at trial (without identifying any specific deficiencies), and (5) that he had been provided with ineffective assistance of counsel on appeal because his appellate counsel had "fail[ed] to raise the above claims in prior proceedings" and failed to "designat[e] the portions of the record necessary for their resolution."

After a hearing conducted on February 8, 2010, at which the petitioner complains the state trial judge refused to allow testimony, the state court denied the petitioner's original and supplemental PCRs. On or about February 12, 2010, the petitioner filed a timely Notice of Intent to seek supervisory review, and the trial judge set a return date of June 1, 2010. The petitioner thereafter filed a timely writ application with the Louisiana Court of Appeal for the First Circuit. Notwithstanding, the intermediate appellate court denied the application on May 24, 2010, without substantive review, upon a finding that the petitioner had failed to comply with the procedural requirements set forth in Rule 4-5 of the Uniform Rules, Louisiana Courts of Appeal, which Rule identifies specific documentation which a petitioner must provide when filing an application for supervisory review. In denying the petitioner's writ application, the appellate court stated:

> **WRIT DENIED ON THE SHOWING MADE.** Relator failed to include the application for post conviction relief and supplements, the state's answer, if any, a complete copy of the trial transcript, and any other portions of the district court record that might support the claims raised in the application for post conviction relief. Supplementation of this writ application and/or an application for rehearing will not be considered.... Any future filing on this issue should include the entire contents of this application, the missing items noted above, and a copy of this ruling. In the event relator elects to file a new application with this Court, the application must be filed on or before July 19, 2010.

The petitioner thereafter filed, on or about July 8, 2010 (within the time allowed by the First Circuit Court to "file a new application"), a second application for supervisory review, which

application was denied without comment on October 14, 2010.  The petitioner subsequently filed

a timely writ application in the Louisiana Supreme Court on or about November 12, 2010, which

application was also denied, with that Court denying review, without comment, on November 4,

2011.  *See State ex rel. Holton v. State*, 75 So.3d 918 (La. 2011).

Finally, on or about November 7, 2011, the petitioner filed the instant habeas corpus

application in this Court.  The State first contends that the petitioner's application in this Court is

untimely and argues, in the alternative, that the application should be denied as being without

substantive merit.

<u>LEGAL ANALYSIS</u>

<u>Contrary To The State's Assertion, The Petitioner's Application Is Timely</u>

Pursuant to 28 U.S.C. § 2244(d), there is a one-year statute of limitations applicable to

federal habeas corpus claims brought by prisoners in state custody.  This limitations period runs

from the date upon which the pertinent judgment becomes final through the conclusion of direct

review or through the expiration of the time for seeking such review.  28 U.S.C. § 2244(d)(1)(A).

As provided by the statute, the time during which a properly filed application for state post-

conviction or other collateral review is pending with respect to the pertinent judgment or claim

shall not be counted toward any part of the one-year limitations period.  28 U.S.C. § 2244(d)(2).

To be considered "properly filed" for purposes of § 2244(d)(2), an application's delivery and

acceptance must be in compliance with the applicable laws and rules governing filings.  *Pace v.

DiGuglielmo*, 544 U.S. 408, 413 (2005), *citing Artuz v. Bennett*, 531 U.S. 4, 8 (2000).  A state

application is considered to be "pending" both while it is before a state court for review and also

during the interval of time between a lower state court's disposition of an application and the

petitioner's timely filing of a properly filed application for review at the next level of state

consideration.  *Melancon v. Kaylo*, 259 F.3d 401, 406 (5th Cir. 2001).

In the instant case, the petitioner's conviction became final on February 7, 2008, ninety days after denial of his application for supervisory review in the Louisiana Supreme Court in connection with his direct appeal.[4]  It appears that the petitioner then allowed two hundred and seventy-one (271) days of un-tolled time to elapse prior to his filing of a PCR application in the state district court on or about November 4, 2008.  Upon the filing of his PCR application, however, the limitations period became tolled, and it remained tolled until February 8, 2010, on which date the state trial court denied the petitioner's application.  Pursuant to Rule 4-3 of the Uniform Rules, Louisiana Courts of Appeal, the petitioner then had, in the absence of an extension of time, thirty (30) days within which to file a timely application for supervisory review before the Louisiana Court of Appeal for the First Circuit.  By thereafter filing, on or about February 12, 2010, within this 30-day period, a Notice of Intent to seek supervisory review in the appellate court, which the trial court subsequently granted by setting a return date of June 1, 2010, outside the 30-day period, the petitioner effectively sought and obtained an extension of time until the latter date.  *See Dixon v. Cain*, 316 F.3d 553, 554 (5th Cir. 2003) (concluding that when a petitioner files a notice of intent to seek supervisory review within the 30-day time period, and the trial court sets a return date outside the 30-day time period, the court has effectively granted the petitioner an extension of time to file his writ application).  Accordingly, inasmuch as an application for post-conviction relief remains pending both during the time that it is before the state court for consideration and also during the interval of time after decision when

---

4. The State incorrectly fails to consider the 90-day period allowed for the petitioner to seek review in the United States Supreme Court, which period must be included in determining the finality of a state court conviction.  *See Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003).

the petitioner is procedurally authorized to proceed to the next level of state court review, *Melancon v. Kaylo, supra*, 259 F.3d at 406, the petitioner's application remained pending at least until June 1, 2010, the date set by the trial court for filing a timely application for supervisory review in the appellate court.[5]

Although the petitioner's first-filed application for supervisory review in the First Circuit court, which was timely filed on or about March 8, 2010, was not properly filed because it did not comply with state procedural rules (specifically because the petitioner did not attach to his application the documentation required by Rule 4-5 of the Uniform Rules), and although the intermediate appellate court thereafter denied the application as not properly filed because of this procedural deficiency on May 24, 2010, this Court finds that the state appellate court implicitly granted the petitioner an extension of time to file his writ application when it stated that the petitioner was authorized to "elect[] to file a new application" and that such application "must be filed on or before July 19, 2010." In the Court's view, this finding of an implicit extension is warranted in light of the Fifth Circuit's decision in *Dixon v. Cain, supra*, where the Court found that an implicit extension had been granted by the trial court when it set a later deadline for filing a writ application and that, as a result, when the petitioner complied with that later deadline, his application remained "not only timely filed but was never in an untimely status." *Id.,* 316 F.3d at 556. Similarly, when the petitioner in the instant case was provided with a later filing date by the appellate court and when he thereafter filed his second application for supervisory review on July 8, 2010, within the time authorized by the appellate court for the filing of a new application,

---

5. The State incorrectly asserts that the interval between the denial of a petitioner's application in a lower state court and his subsequent timely filing of a writ application in a state appellate court should be counted against him.

the application may be seen to be both timely and properly filed for purposes of tolling of the one-year limitations period. Accordingly, no additional time elapsed from the limitations period during the interval between the denial of the petitioner's PCR application in the state trial court and the filing of his writ application in the intermediate state appellate court. *Cf., Howard v. Cain*, 2011 WL 3794909, *3 (M.D. La. Aug. 2, 2011) (concluding, without discussion, that the appellate court's authorization for the petitioner to file a new writ application by a certain date did not result in a tolling of the limitations period).

Finally, after the filing of the petitioner's writ application in the intermediate appellate court on July 8, 2010, the time period thereafter remained tolled (1) while the application was thereafter pending in that court, (2) during the interval between the denial by that court of the petitioner's writ application on October 14, 2010, and his subsequent filing of a timely writ application in the Louisiana Supreme Court on November 12, 2010, and (3) while the application was pending before the Louisiana Supreme Court, up until the denial of the writ application by that Court on November 4, 2011. As a result, when the petitioner filed his habeas corpus application in this Court on November 7, 2011, only three (3) additional days may be seen to have elapsed on the one-year time clock. When these three days are added to the 271 days which the Court has determined elapsed prior to commencement of the petitioner's PCR proceedings, it is apparent that only 274 days of untolled time elapsed during which the petitioner did not have pending before the state courts a properly filed application for post-conviction or other collateral review. Accordingly, the petitioner's habeas corpus application before this Court is timely.

<u>Legal Standard Upon Substantive Review</u>

Turning to a substantive review of the petitioner's claims, the standard of review in this Court is that set forth in 28 U.S.C. § 2254. Specifically relevant is 28 U.S.C. § 2254(d)(1),

13

which provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Relief is also available if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the prisoner's case or reaches a decision based on an unreasonable factual determination. *See* 28 U.S.C. § 2254(d)(1)-(2); *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). Mere error by the state court or this Court's disagreement with the state court is not enough: The standard is one of objective reasonableness. *Id. See also Williams v. Taylor, supra*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"). State court determinations of underlying factual issues are presumed correct, and the petitioner has the burden to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1399 (2011).

The Court finds that, applying this standard to the petitioner's claims, there is no basis for the granting of habeas relief.

1.  The Petitioner's Claim Relative To A Purported
Newly Discovered Witness, Jeremy Holton, Is Without Merit

In the petitioner's first ground for relief, he asserts that his right to due process was violated by the failure of the state trial court to consider new evidence discovered after the petitioner's conviction.  In this regard, he asserts that on or about July 17, 2006, while his direct appeal was pending before the state appellate courts, he filed a motion for new trial in the state trial court wherein he asserted that a new witness had been discovered, identified as Jeremy Holton, who would allegedly testify that Ronnie Buratt had stated to Jeremy Holton, "on or about mid March, 2006"  that the petitioner "had nothing to do with the killing."  According to the petitioner, the trial court did not specifically rule on the referenced motion for new trial and did not hear testimony from the new witness.  Further, although the petitioner thereafter asserted this claim in his subsequent PCR application, the state trial court denied that application without the introduction of any evidence or testimony.

The federal test for determining whether newly discovered evidence may warrant the granting of habeas corpus relief is founded upon the decision of the United States Supreme Court in *Berry v. State*, 10 Ga. 511, 1851 WL 1405 (1851).  Pursuant to the so-called *Berry* test, the four elements that a petitioner must show in order to obtain a new trial based upon newly discovered evidence are (1) that the evidence is in fact newly discovered and was unknown to him at the time of trial, (2) that the failure to discover the evidence was not due to a lack of diligence, (3) that the evidence is material and not merely cumulative, and (4) that the evidence would probably have produced an acquittal at trial.  *See United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011).  This is similar to the standard for granting a new trial based upon newly

discovered evidence under Louisiana law.[6]

Applying the foregoing standard, the Court finds that the petitioner's claim is without merit and that he has wholly failed to meet his burden of establishing any of the elements pertinent to the *Berry* test. In the first place, the petitioner's assertion regarding the alleged new evidence is conclusory in the extreme, with the totality of his assertion before this Court and before the state courts being that the new witness, Jeremy Holton, would testify that, "on or about mid March, 2006, former co-defendant Ronnie Buratt stated [in the presence of Jeremy Holton] that the defendant had nothing to do with the killing of the victim." *See* Rec. Doc. 1-1 at p. 14. The petitioner has not, however, produced an affidavit executed by the purported new witness or any other indication that the witness would in fact testify as indicated. Nor does the petitioner provide any factual details regarding the circumstances surrounding the petitioner's discovery of the referenced witness or any explanation as to why the information was not previously discovered or discoverable. Finally, the purported statement by the new witness refers only to an alleged hearsay remark made by Ronnie Buratt, without any factual detail regarding when or under what circumstances Buratt made the remark, and even were the new evidence to be admitted, it is unlikely that the evidence would "probably produce" an acquittal of the petitioner. Specifically, inasmuch as there were admittedly no eyewitnesses to the commission of the offense, any statement by Buratt that the petitioner had not been involved would be of limited probative value. Further, the alleged hearsay statement by Buratt contradicts Buratt's former sworn testimony at trial that the petitioner admitted to having committed the

---

6. La. Code Crim. P. art. 851(3) provides that a new trial shall be granted when "[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty."

offense, and the new evidence would do nothing to detract from the substantial weight of other independent evidence pointing towards the petitioner's guilt, which evidence included testimony by witness Shane Richey that the petitioner had admitted to committing the offense, testimony by five (5) witnesses (Amanda Gros, Penny Zito, Brandon Everett, Matthew Everett and Toni Everett) that the petitioner had threatened, prior to the offense, that if he could not have a relationship with his ex-girlfriend, nobody would, testimony indicating that the petitioner had induced friends to assist in reporting the blue GMC vehicle stolen and in disposing of evidence connected to the offense, and testimony reflecting that on the night of the offense, the petitioner had been in possession of the vehicle involved in the offense and had later taken steps to dispose of that vehicle, which vehicle was also found to have had physical damage and gunshot residue evidence consistent with commission of the offense. In this regard, the Court notes that the petitioner does not make an assertion in this case that the evidence was not sufficient to support his conviction. Thus, the purported new evidence, being of limited probative value and offered by a person who is apparently related to the petitioner (judging from the witness' last name), may not be seen to warrant the grant of habeas corpus relief in this case. *See Smith v. Quarterman*, 2008 WL 2465400, *6 n. 63 (W.D. Tex. June 17, 2008) (noting that alleged new evidence, in the form of a hearsay statement which would only impeach the sworn testimony of a former witness and which would not detract from other independent evidence of guilt, did not warrant habeas relief).

Furthermore, the United States Supreme Court has recognized, in *Herrera v. Collins*, 506 U.S. 390, 400 (1993), that free-standing '[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." The *Herrera*

17

Court went on to assert that any required showing "for such an assumed right would necessarily be extraordinarily high." *Id.* at 417. Consequently, "... it is the law of this circuit that 'the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.'" *See Jacobs v. Scott*, 31 F.3d 1319, 1324 (5th Cir. 1994), *quoting Boyd v. Puckett*, 905 F.2d 895, 896-97 (5th Cir. 1990). Although the petitioner complains in this case that the state trial court failed to allow testimony from the purported new witness at a hearing scheduled in connection with his post-conviction relief proceedings, this assertion does not amount to "an independent constitutional violation occurring in the underlying state criminal proceeding" which would warrant habeas corpus relief, particularly in light of the limited apparent value of the purported new evidence. Accordingly, the petitioner's claim in this regard must be rejected.

### 2. The Petitioner's Claim Relative To The State Having Withheld Evidence Of Offers Of Leniency Made To Witnesses In Exchange For Testimony Is Without Merit

In the petitioner's second ground for relief, he asserts that the prosecution withheld evidence from the defense relative to favorable deals purportedly made between the State and two prosecution witnesses, Ronnie Buratt and Shane Richey, pursuant to which the State allegedly offered leniency to the witnesses in connection with their then-pending criminal charges in exchange for their testimony against the petitioner at trial.[7] In support of this contention, the petitioner points to (1) his interpretation of statements made by the witnesses during taped jailhouse telephone conversations prior to trial, and (2) the asserted favorable termination of the witnesses' respective criminal prosecutions.

---

7. Although the petitioner's memorandum suggests that the prosecution made favorable deals with four (4) prosecution witnesses, he only discusses witnesses Ronnie Buratt and Shane Richey in the instant habeas corpus application.

The petitioner's contentions relative to this claim are not persuasive. In this regard, the misrepresentation or the withholding by the prosecution of evidence of a favorable deal or offer of potential leniency between the prosecution and a witness in exchange for testimony against an accused is constitutionally prohibited. *See Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois,* 360 U.S. 264 (1963); *Tassin v. Cain*, 517 F.3d 770, 778 (5ᵗʰ Cir. 2008) ("*Giglio* and *Napue* set a clear precedent, establishing that where a key witness has received consideration or potential favors in exchange for testimony and lies about those favors, the trial is not fair"). *See also Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"). Nonetheless, a petitioner must be able to offer sufficient evidence that a witness has in fact either received an offer of leniency or anticipated receiving leniency from the State in exchange for such testimony. *See Coleman v. Cain*, 2014 WL 348541, *6 (E.D. La. Jan. 31, 2014); *Frazier v. Warden La. State Penitentiary*, 2008 WL 4104521, *6 (W.D. La. July 10, 2008); *Dowthitt v. Johnson*, 230 F.3d 733, 756 n. 33 (5ᵗʰ Cir. 2000). The petitioner is unable to meet his burden in this regard.

The record reflects that prior to trial in this case, the petitioner's attorney twice formally requested information regarding deals or offers of leniency made by the prosecution in exchange for testimony, and the prosecutor twice responded that no deals or offers had been made. *See* Tr. Rec. at p. 53 (Motion to Reveal Identity of Informants and All Deals), Tr. Rec. at p. 59 (Motion for Exculpatory Evidence), and Tr. Rec. at pp. 937 and 975-78 (reflecting statements made by the prosecuting attorney at hearings conducted on March 14 and June 30, 2005, respectively). In addition, when directly questioned at trial whether any leniency had been offered to them, both Ronnie Buratt and Shane Richey testified that no promises or offers of leniency had been made.

*See* Tr. Rec. at pp. 701 and 720.  The petitioner has not refuted these sworn assertions.  To the contrary, all that the petitioner has presented relative to this claim are (1) handwritten notes which he made from recorded jailhouse conversations engaged in by these witnesses prior to trial, and (2) the supposedly favorable terminations of the witnesses' respective criminal prosecutions.  The petitioner's assertions and evidentiary showing, however, do not establish to any degree of certainty that leniency was either offered or provided.

First, with regard to witness Ronnie Buratt, the petitioner relies upon hand-written notes which he made from a taped conversation between this witness and the witness' mother on September 14, 2004, only two weeks after commission of the offense and approximately ten months prior to the petitioner's trial, during which the witness allegedly stated (1) that he had spoken with a detective and with the district attorney on that date, (2) that "when we go to court I'm coming home," and (3) that, "they're just holding me here to make sure they can keep my testimony."  *See* Rec. Doc. 2 at p. 159.[8]  The petitioner further asserts that Buratt was released immediately after providing testimony at the petitioner's trial in July, 2005, and that the pending criminal charge against Buratt was subsequently dropped.

The purported statements made by Buratt during the referenced jailhouse conversation, in

---

8.  The petitioner's notes reflect the following conversation:

| | |
|---|---|
| Ronnie [Buratt]: | Yeah, I talked to one detective today. |
| Alice: | Uh huh.  Ya'll still making headlines .... |
| Ronnie: | I hear that Mama.  We can make them, but I'll tell you what, when we go to court I'm coming home. |
| Alice: | Okay, well, we'll just have to cross that bridge when you get there. |
| Ronnie: | Yeah, cause I talked to the D.A. today, you know, they're holding me here just to make sure they can keep my testimony Mama. |
| Alice: | Huh. |
| Ronnie: | They're keeping me in here cause they want my testimony.... Yeah, I just talked to the detective today too though. |

the Court's view, are ambiguous at best and do not establish, to any degree of certainty, that any offer of leniency was made to the witness in exchange for his testimony. Accepting for purposes of this application that the petitioner's hand-written notes accurately reflect the substance of the referenced telephone conversation between Buratt and his mother, that conversation took place shortly after the commission of the offense and were made prior to Buratt's arraignment, entry of a plea, or preliminary examination in connection with the charge of being an accessory after the fact to first degree murder. Thus, Buratt's statement that he would be "coming home" after a court appearance is not subject to interpretation as referring to an offer of leniency by the State in exchange for testimony against the petitioner at a later trial. In point of fact, after a preliminary examination conducted on December 13, 2004, the state court found that probable cause existed to hold Buratt in connection with the referenced charge, and Buratt was thereafter maintained in custody with a bond set at $250,000.00 (reduced to $125,000.00 in May, 2005). *See* Rec. Doc. 2 at pp. 160-61. Finally, although the petitioner contends that Buratt was released "immediately" after he provided testimony at the petitioner's trial, there is no evidence tendered to support this contention. To the contrary, a review of pertinent Minute Entries relative to Buratt's criminal proceedings reflects that, whereas the charge levied against the witness was ultimately dismissed, such dismissal did not occur until September 12, 2005, two months *after* the petitioner's trial, and then only after a hearing conducted in connection with a Motion to Quash filed in state court. *See id.* Thus, there is no factual basis for concluding that a favorable deal or offer of leniency was in fact tendered to Buratt in exchange for his testimony.

Second, with regard to a supposed deal or offer of leniency tendered by the State to witness Shane Richey, the petitioner's evidence similarly fails to sufficiently establish the existence of such a deal or offer. The petitioner's evidence reflects that this witness faced

21

prosecution in connection with numerous unrelated counts of monetary instrument abuse (two counts), theft of property valued at greater than $500.00 (three counts), forgery (five counts), and unauthorized use of an access card (one count).  *See* Rec. Doc. 2 at pp. 162-65.  Although the petitioner interprets the ensuing taped telephone conversations as reflecting an offer of leniency by the prosecution in exchange for testimony at the petitioner's trial, the Court interprets these conversations, in contrast, as only reflecting plans by Richey to avoid conviction in connection with the referenced charges by paying money back to the purported victims, by thereafter obtaining letters from the victims reflecting an unwillingness to pursue prosecution, and by thus making it difficult for the prosecution to prove its case and obtain convictions.  The petitioner's hand-written notes from these conversations, even if accepted as true and accurate, include numerous references to such a plan and include no clear or specific reference whatever to any deal or offer of leniency in exchange for testimony at the petitioner's trial.  *See* Rec. Doc. 2 at pp. 165-174.  Moreover, the pertinent Minute Entries relative to Richey's criminal prosecution reflect that on March 22, 2005, several months *prior* to the petitioner's trial, Richey pleaded guilty to certain of the charges levied against him and was sentenced at that time to one year in confinement, with credit for time served and with a dismissal of the remaining counts.  *See* Rec. Doc. 2 at pp. 162-65.  The fact that Richey's guilty plea and sentence in connection with the pending charges were entered months *prior* to the petitioner's trial does not support a finding that the plea and sentence were given in exchange for testimony which Richey had not yet even provided.  Accordingly, the Court concludes that the petitioner has failed to show an entitlement to relief in connection with this claim and that the claim should be rejected.[9]

---

9.  The Court further notes that, in evaluating potential prejudice resulting from the non-disclosure of alleged impeachment evidence, a petitioner must show that the suppressed

### 3. The Petitioner's Claim Relative To The State Having
### Presented False And Misleading Expert Testimony Is Without Merit

In his third claim for relief, the petitioner asserts that the prosecution presented false and

misleading expert testimony at trial regarding an analysis of glass shards found at the scene of

the shooting.  Specifically, the petitioner complains that whereas a written report prepared by the

testifying F.B.I. glass expert prior to trial indicated that certain glass shards found at the scene

"likely" originated from the two vehicles purportedly driven by the petitioner and the victim on

the night of the offense – because those shards were "physically, optically and compositionally

indistinguishable in all measured properties" from glass obtained from the respective vehicles –

the expert testified at trial to an unwarranted greater degree of certainty.  Specifically, the

petitioner points to the expert's affirmative statement at trial, in response to a question by the

prosecution, that the witness was "able to *verify*" that the glass shards came from the two

referenced vehicles.  (Emphasis added).  Specifically, the expert testified at trial as follows:

Q:      What results did you reach or what results did you determine:

A:      There was glass in the intersection that was indistinguishable from the glass from

---

evidence is material to the petitioner's guilt.  *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001).
Evidence is material under *Brady v. Maryland, supra*, if it "could reasonably be taken to put the
whole case in such a different light as to undermine confidence in the verdict."  *Kyles v. Whitley*,
514 U.S. 419, 434-35 (1995).  Further, when evaluating the materiality of impeachment
evidence, a Court must consider "the nature of the impeachment evidence improperly withheld
and the additional evidence of the defendant's guilt independent of the disputed testimony."
*Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994).  "[W]hen the testimony of the witness who
might have been impeached by the undisclosed evidence is strongly corroborated by additional
evidence supporting a guilty verdict, the undisclosed evidence generally is not found to be
material."  *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004).  In the instant case,
considering that the evidence suggesting the existence of an offer of leniency made by the
prosecution to either Ronnie Buratt or Shane Richey is tenuous at best, and considering the
strength of the independent evidence in the record which both corroborates these witnesses' trial
testimony and which points to the petitioner's guilt, the Court is unable to conclude that the
referenced impeachment evidence undermines confidence in the verdict.

the passenger side window of the victim's vehicle, and there was also glass in the intersection that was indistinguishable from the passenger side window of the suspect's vehicle.

Q:    So basically what you're saying, there was a sample that contained two types of glass. When you ran the analysis and you had your references, you had a pure sample from the victim's truck and a pure sample from the suspect's truck and there was a sample [from the intersection] that you was able to verify contained both of those reference samples.

A:    That's correct.

Tr. Rec. at pp. 605-06.

Notwithstanding the foregoing, the petitioner concedes that his attorney cross-examined the State's expert, and it appears that, although inartfully done, the attorney was able to elicit from the witness that there is always some degree of uncertainty when analyzing glass samples which have not been taken directly from a vehicle's window and with determining whether the samples are actually associated with that window. Thus, in addressing the manner in which the witness had labeled the various samples tested, the expert stated:

A:    ... [I]f there is a broken window, the pieces that you get out of the window frame are considered to be a better known sample than, for instance, the glass that's fallen out and is immediately adjacent to the window. There is always some [question] whether or not that glass could have come from a different source even if it's right below where the broken object is. You cannot know for sure that that is the same glass.

*Id.* at p. 611. And further, in addressing a sample labeled as "Q-5" (with "Q" denoting a "question" relative to the sample), which sample consisted of glass fragments collected from the floorboard of the suspect's vehicle, the petitioner's attorney pointed out that the "Q" designation denoted a degree of uncertainty relative to the ultimate origin of the fragments. Thus:

Q:    ... [I]t's Q-5 I think that I meant to ask you about came from the floorboard of the alleged suspect's truck; Is that right?

A:    That's correct.

24

Q:     So that would be one of those instances where you have to put a "Q" there because you said it could never be known if it came directly from that window; Is that right?

A:     That's right.  I can't know for sure whether it came from the broken window.

*Id.* at p. 612.  Thus, consistent with the expert's written report, the petitioner's attorney elicited that there was some degree of uncertainty in the evaluation of the referenced glass shards and, accordingly, the petitioner can point to no prejudice resulting from the alleged inaccurate statement made by the witness which suggested her ability to "verify" the origin of the glass. For this reason, the petitioner's claim relative to the presentation of false or misleading testimony is misplaced and should be rejected.[10]

### 4.     The Petitioner's Claim That the State Withheld Impeachment Evidence Obtained From A Trial Witness, Ashley Alford, Is Without Merit

In his fourth claim for relief, the petitioner complains that the State withheld exculpatory evidence which the State allegedly obtained two weeks prior to trial.  Specifically, the petitioner asserts that on November 15, 2008, three years *after* the trial, he was visited by a trial witness, Ashley Alford, who informed him of an interview which she had participated in with prosecutors

---

10.  The petitioner's memorandum also makes reference to a purported "evidentiary ruling" by the state court relative to the expert's testimony, *see* Rec. Doc. 1-1 at p. 25, but the record does not reflect that any such ruling was made, and even had it been, the evidentiary rulings of a state trial court are generally not a proper subject for habeas review in any event. *See Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993).  Further, whereas the petitioner complains that the prosecution overstated the substance of the glass expert's testimony in closing arguments, representing to the jury that the witness had stated that there was "no margin of error" relative to the glass shard evidence, the Court will not address this contention because the petitioner has not asserted a specific claim of prosecutorial misconduct in this case relative to the State's closing arguments.  Moreover, the petitioner's counsel pointed out the referenced overstatement during the defense's closing argument, noting that "[i]t was not the glass expert that said there was no margin of error.  It was the gunshot residue expert said that was no margin of error."  *See* Tr. Rec. at p. 894.  This leads to a conclusion that the referenced overstatement was likely an inadvertent error on the part of the prosecution and was harmless error in any event.

two weeks prior to trial, during which she purportedly informed prosecutors that she "possessed information that would have impeached four State witnesses," specifically that she had "personal knowledge" that witnesses Penny Zito, Amanda Gros, Brandon Everett and Matthew Everett "had fabricated the contents of their statements" to law enforcement officials. According to the petitioner, this information could have been utilized to impeach the testimony of the four witnesses at trial.

Pursuant to *Brady v. Maryland*, *supra,* and it progeny, the prosecution's suppression of evidence that is both favorable to the accused and material to either guilt or punishment violates due process, regardless of whether or not the prosecution acted in good faith or bad faith in failing to make a timely disclosure of the evidence. *Id.* To establish a *Brady* claim, the petitioner must show that (1) the prosecution suppressed evidence, (2) the suppressed evidence was "favorable to the accused," and (3) the evidence was "material" either to guilt or punishment. *See, e.g., Brogdon v. Butler*, 790 F.2d 1164, 1167 (5th Cir. 1986). Evidence that is "favorable to the accused" includes evidence that tends directly to exculpate the accused as well as evidence that impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. *See Strickler v. Green,* 527 U.S. 263, 280 (1999). The question of materiality is one of a "reasonable probability" of a different result and whether the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, *supra,* 514 U.S. at 434-35. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434. As previously noted, when evaluating the materiality of impeachment evidence, a Court must consider "the nature of the impeachment

evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony." *See Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994).

The petitioner's claim in this regard should be rejected. In the first place, both Brandon and Matthew Everett testified at trial that their earlier statements to investigating officials were false and that they had not in fact overheard the petitioner make threatening remarks two weeks prior to the offense. Accordingly, any additional information provided by Ashley Alford regarding the supposed falsity of these witnesses' prior statements would not have materially aided the defense. Further, the petitioner has provided no information whatever regarding the substance of Ms. Alford's purported "personal knowledge" that Penny Zito and Amanda Gros had fabricated their statements or the factual basis for such knowledge. Nor has he provided an affidavit or other documentation to corroborate his assertion that Ms. Alford in fact provided material information to prosecutors during the weeks prior to trial. He has thus failed to establish, to any degree of certainty, that information was obtained by the prosecution which was withheld from the defense. Nor has the petitioner shown that this information was of such weight, when compared to the substantial evidence of the petitioner's guilt, as to undermine confidence in the verdict or to suggest that the petitioner did not receive a fair trial. The mere conclusory assertion that Ms. Alford "possessed information" or had "personal knowledge" that she imparted to prosecutors and that impeached certain witnesses does not, therefore, meet the test of materiality set forth in *Kyles v. Whitley*, *supra*. Accordingly, the petitioner has failed to meet his burden in connection with this claim, and the claim should be rejected.

5. The Petitioner's Claim That The State Presented False
And Misleading Testimony Regarding When He Possessed
The Blue GMC Vehicle On The Night Of The Offense Is Without Merit

In the petitioner's fifth claim for relief, he asserts that the State presented false and

misleading evidence by eliciting testimony from two witnesses at trial, Toni Everett and Ashley Alford, that they had observed the petitioner in possession of Buratt's blue GMC truck at around 9:30 or 9:45 p.m. on the night of the murder.  In this regard, the petitioner asserts that the State had in its possession a surveillance video and photograph from the commercial establishment where these witnesses worked which reflected that the time he was actually at the establishment was in fact 8:51 p.m., when he purchased gas for the vehicle.  The petitioner asserts that this earlier time was consistent with his defense, which was premised upon the statement given by Buratt to investigating officials on the night of the offense, that the petitioner had returned the vehicle to Buratt's house at around 9:10 p.m. that evening, prior to the occurrence of the shooting.

The petitioner's argument is not persuasive.  In their respective testimony, Ashley Alford and Toni Everett both *estimated* the time that they saw the petitioner on the night of the offense, and Toni Everett testified that she didn't even see the petitioner's vehicle at that time because she was in back cleaning up.  Further, Ronnie Buratt's statement that the petitioner returned the vehicle at around 9:10 p.m. that night was later retracted by him in any event, both in a subsequent statement by the witness and in testimony at trial, when the witness acknowledged that the petitioner had never returned the vehicle on the night of the offense.  Further, evidence was introduced that the petitioner was still in possession of the blue GMC vehicle the next morning, when he went very early to Roger Holder's residence and obtained assistance in taking the vehicle to Michael Inman's residence in Springfield, Louisiana.  Finally, as pointed out by the State, whereas the petitioner seeks to assert that the exact time that he possessed the blue GMC vehicle was of critical importance to his defense, the prosecution was likely less concerned with the exact time of such possession and more concerned with establishing the critical fact that

the petitioner in fact possessed the vehicle involved in the offense on the night thereof and

shortly prior thereto.  As further pointed out by the State, the petitioner's attorney had possession

of the same referenced surveillance evidence prior to trial, through "open file" discovery of the

prosecution's evidence, and had an opportunity to focus on the disparity between the time in the

surveillance video and the times provided by the testimony of witnesses Alford, Everett and

Buratt.  Accordingly, the petitioner cannot complain regarding the purported misleading

testimony presented by witnesses Alford and Everett.

> 6.  The Petitioner's Claim That His Right Of Confrontation Was Violated
> When The State Misled The Court While Objecting To The Defense's
> <u>Cross-Examination of Detective Melvin Boudreaux Is Without Merit</u>

In the petitioner's sixth claim for relief, the petitioner asserts that the prosecution misled

the state trial court during an objection made by the State to the defense's questioning of

Detective Melvin Boudreaux at trial.  Specifically, after Detective Boudreaux testified on direct

examination that a statement obtained from witness Shane Richey was consistent both with

statements obtained from Ronnie Buratt and with other information obtained during the

investigation, *see* Tr. Rec. at pp. 781-82, the petitioner's attorney sought to challenge this

assertion on cross-examination by pointing out inconsistencies in the statements for the purpose

of attacking the credibility of Richey, Buratt and Boudreaux.  According to the petitioner, the

State objected to this line of questioning for the purported reason that it could potentially reveal

inadmissible prior criminal conduct by the petitioner and thereby taint the trial.  The petitioner

complains that this objection led to restrictions upon the cross-examination of Detective

Boudreaux and thus violated his right of confrontation relative to this witness.

The petitioner's argument is unfounded.  The trial record reflects that, instead of making

an objection to the cross-examination of Detective Boudreaux, the prosecution merely requested

a bench conference, and the substance of the ensuing bench conference was not recorded for this Court's review. *See* Tr. Rec. at p. 784. Accordingly, this Court is unable to evaluate the propriety of any assertions or representations made by the prosecution during the conference.[11] Further, the Court issued no formal ruling after the conference, and the petitioner's attorney noted no objection to such a ruling or to any limitation upon the scope of cross-examination. Finally, the record reflects that after the conference, the petitioner's attorney proceeded to question Detective Boudreaux concerning discrepancies between the statements of witnesses Richey and Buratt and so was able to dispute the detective's assertion that Richey's statement was consistent with Buratt's and with other evidence uncovered during the investigation. In addition, the petitioner's attorney was also able to question Richey and Buratt themselves on cross-examination and so had an opportunity to further point out discrepancies in their respective statements. Thus, the petitioner's assertion that his right of confrontation was violated by the State's objection to the questioning of Detective Boudreaux is substantially undermined.

In addition to the foregoing, the right to confront witnesses through cross-examination is not unlimited, and "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Further, a complaint that a trial court has unduly restricted the cross-examination of a

---

11. The trial court record reflects that the attorneys for both the petitioner and the State had previously agreed, on the record, that in the event that either attorney wanted a particular bench conference recorded, they were to advise the court, whereupon microphones would be made available to record the conference. *See* Tr. Rec. at pp. 573-74.

state's witness is subject to harmless error analysis. *Delaware v. Van Arsdall, supra*, 475 U.S. at 684. Thus, to be entitled to relief on a claim regarding the violation of his Sixth Amendment right to confrontation through limitations imposed upon cross-examination, the petitioner must show, not only that the right was violated, but also that the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Slaughter v. Epps*, 326 Fed. Appx. 731, 733 (5th Cir. 2009), *quoting Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). This Court is unable to conclude that the petitioner has satisfied either requirement in connection with this claim. Accordingly, the claim should be rejected as being without merit.

### 7-8. The Petitioner's Claim That He Was Provided With Ineffective Assistance Of Counsel At Trial And On Appeal Is Without Merit

In the petitioner's seventh and eighth claims for relief, he complains that he was provided with ineffective assistance of counsel at trial and on appeal.

A habeas petitioner who asserts that he was provided with ineffective assistance of counsel must affirmatively demonstrate (1) that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial in which the result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel. *Id.*

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. *See, e.g., Martin v. McCotter*, 796 F.2d 813,

31

816 (5th Cir. 1986). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy. *See, e.g., Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988). This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *Martin v. McCotter, supra*, 796 F.2d at 817. Great deference is given to counsel's exercise of professional judgment. *Bridge v. Lynaugh, supra*, 838 F.2d at 773; *Martin v. McCotter, supra*, 796 F.2d at 816.

If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors. *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988). To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland v. Washington, supra*, 466 U.S. at 693. Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Martin v. McCotter, supra*, 796 F.2d at 816. The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome." *Id.* at 816-17. In order to establish prejudice in connection with a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient performance. *Briesno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

The above showing is one that the petitioner cannot meet in the instant case. With regard to the petitioner's trial counsel, the Court first finds that the petitioner has failed to exhaust state

court remedies relative to this claim as mandated by 28 U.S.C. § 2254(b) and (c). Pursuant to this statute, a claimant seeking federal habeas corpus relief is required to first exhaust his claims by presenting them for review before the courts of the state in which he is confined. The exhaustion requirement is satisfied only when a petitioner's claims have been properly presented before the state courts, either on direct review or on post-conviction attack. *Bufalino v. Reno,* 613 F.2d 568, 570 (5th Cir. 1980); *Lathers v. Cain*, 2011 WL 1793274, *5 (M.D. La. April 7, 2011).

It is clear from a review of the state court record that the petitioner has not exhausted state court remedies relative to his claim regarding the alleged ineffectiveness of his trial attorney. Specifically, although the Petitioner asserted in his supplemental PCR application filed on November 9, 2009, that he was provided with ineffective assistance of counsel at trial, he failed to designate any specific deficiencies committed by his attorney. To the contrary, the petitioner stated in the application only that, "[t]his bare ineffective assistance of counsel claim is being raised in anticipation of any and all errors attributed to trial counsel by the State," and "[a]ctual allegations of deficient performance shall be raised by the prosecution." Thus, the petitioner failed to properly present any actual claims of defective performance for review by the state court, and this claim is subject to dismissal for this reason.

Further, in the alternative, the petitioner complains in this context only of (1) the failure of his trial attorney to interview witness Ashley Alford prior to trial and thereby ascertain that Ms. Alford possessed information which could have been utilized to impeach the statements of other witnesses as outlined in Claim No. 4, *supra*, and (2) the failure of his trial attorney to effectively cross-examine the F.B.I. glass expert relative to her conclusion that glass from both Buratt's blue GMC vehicle and the vehicle driven by the victim were found in the intersection

where the offense occurred.  The petitioner's assertions in this regard are not persuasive.  As

previously noted, Ms. Alford testified at trial and was cross-examined by the petitioner's

attorney, and the petitioner has not produced an affidavit by this witness or any other credible

evidence establishing that Ms. Alford in fact possessed information other than that which she

provided at trial.  Nor has the petitioner provided any factual basis for the witness' purported

"personal knowledge" that other witnesses had fabricated their respective statements.  And with

regard to the glass expert, the petitioner complains of the failure of his attorney to pursue a line

of questioning on cross-examination relative to where in the intersection glass shards from the

vehicles had been located.  The Court, however, will not second-guess the strategic decisions of

counsel in determining the best way to cross-examine the referenced expert.  It was established

at trial that the passenger-side window of the GMC vehicle and both the passenger and driver-

side windows of the victim's vehicle were shattered during the commission of the offense, that

there were no eyewitnesses to the offense itself, and that shards of glass were found in the

roadway which were indistinguishable from glass taken from the two vehicles.  The Court does

not find it likely that pursuing the line of questioning proposed by the petitioner, "more likely

than not," would have altered the outcome of the case, and the failure to do so by the petitioner's

attorney  certainly does not undermine the Court's confidence in the outcome of the trial.

Accordingly, this claim is without merit.

  Finally, with regard to the petitioner's claim regarding alleged ineffective assistance of

counsel on appeal, he complains that "significant portions" of the trial testimony were not

transcribed and are therefore missing from the trial transcript, notably (1) part of the testimony of

the F.B.I. glass expert regarding the existence of a "margin of error" in connection with glass

analysis, and (2) part of the testimony of a Sheriff's Office employee, Cox Daigle, regarding

whether the location of glass found at the scene of the murder supported the prosecution's theory of the case. The petitioner also complains that his appellate attorney failed to include the taped jailhouse conversations of witnesses Shane Richey and Ronnie Buratt for review by the appellate court and failed to adequately "designate[e] the portions of the record necessary for review." These assertions are without foundation. The Court's review of the trial transcript does not support the petitioner's assertion that any portion of the trial testimony was not transcribed or is missing from the record. Further, as discussed above, the jailhouse conversations upon which the petitioner relies do not support his contention that offers of leniency were made to Shane Richey and Ronnie Buratt in exchange for their testimony. Finally, the petitioner has not pointed to any other part of the trial record which was not designated for review by the state appellate court and which was needed for such review. Accordingly, the Court has not shown that there was any constitutional deficiency in the assistance provided by appellate counsel which may be seen to have resulted in prejudice to the petitioner. This claim, therefore, must be rejected.

  9. The Petitioner's Claim That The Trial Court Erred By Refusing To Permit The <u>Presentation Of Evidence At The Petitioner's Post-Conviction Relief Hearing Is Without Merit</u>

   Finally, in the petitioner's ninth claim for relief, he asserts that the state trial court erred by refusing to allow the presentation of testimony at a scheduled hearing on the petitioner's application for post-conviction relief. This claim, however, is one regarding a mere deficiency in the state habeas proceedings, and such a claim is not a proper subject of federal habeas corpus review. *Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Cir. 2001) (noting that "infirmities in state habeas proceedings do not constitute grounds for relief in federal court"). "An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'" *Nichols v.*

*Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995), *quoting Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987); *See also Reynada v. Quarterman*, 2006 WL 2331051, *3 (S.D. Tex. Aug. 9, 2006) (rejecting a habeas petitioner's assertion that the state court "erred in failing to hold an evidentiary hearing on his claims"). This claim, therefore, is also without legal foundation and should be rejected.

### Certificate of Appealability

Pursuant to statute, an appeal may not be taken to the federal court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although the petitioner has not yet filed a Notice of Appeal, this Court may nonetheless address whether she would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000). A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In the instant case, the Court finds that reasonable jurists would not debate the denial of the petitioner's § 2254 application or the correctness of the district court's ruling. Accordingly, it is appropriate that, in the event that the petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

### RECOMMENDATION

It is recommended that the petitioner's application for habeas corpus relief be denied. It

is further recommended that in the event that the petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on June 17, 2014.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE**